HARRIET FREE, formerly Harriet Elberson, Plaintiff and Respondent, v. PAUL ELBERSON and Deer Lodge Bank & Trust Company, Defendants and Appellants.

No. 11928.
Submitted May 13, 1971.
Decided June 29, 1971.
486 P.2d 857.

William R. Taylor, argued, Deer Lodge, Poore, McKenzie

& Roth, James A. Poore, argued, Butte, J. Robert Riley, Missoula, for defendants-appellants.

Lloyd J. Skedd, argued, Helena, for plaintiff-respondent.

MR. JUSTICE DALY delivered the Opinion of the Court.

This is an action brought by plaintiff Harriet Free, formerly Harriet Elberson, against her former husband Paul C. Elberson, and the Deer Lodge Bank & Trust Company, defendants. Plaintiff alleged in her complaint the defendants conspired to withhold her share of certain funds deposited with the bank under a court order issued in a divorce action between Harriet Elberson and Paul C. Elberson. Plaintiff further alleged the deposit of funds constituted a *special* account established by court order and that the funds were converted by the defendants.

The case was tried in Powell County before a jury, the Honorable Philip C. Duncan presiding. The jury returned its verdict in favor of Harriet Free and against the defendant Deer Lodge Bank & Trust Company but not against the defendant Paul C. Elberson. Judgment was entered accordingly.

Actual damages were awarded in the amount of $2,612.76 and punitive damages in the sum of $25,000. From this final judgment defendant bank appeals.

In June 1967, the plaintiff Harriet Elberson and defendant Paul Elberson, then husband and wife, became involved in a divorce action. At the inception of the action the court issued a restraining order enjoining defendant, Paul Elberson, his agents, employees or attorneys from disposing of, concealing, removing out of the state, or encumbering any of his property until further order of the court. The bank was not a party to the divorce action and no service was had on it, but only on defendant Paul Elberson.

At that time Deer Lodge Bank & Trust Company had a *perfected security interest* in cattle which Paul Elberson claimed to own and which he had mortgaged and sold with his individ-

ual signature in prior times, but in which Harriet Elberson claimed a half interest at the time of the divorce proceeding. The cattle brand stood in the name of Paul C. Elberson or Harriet Elberson or William Paul Elberson, their son. In the divorce action an order of the court was made on November 8, 1967, providing that the calf crop from the cattle be sold and the proceeds deposited in a *special* account in the Deer Lodge Bank & Trust Company. The record shows that the cattle in fact had been sold on November 4, 1967. Mr. Alfred Donich, a vice president of the bank with whom Elberson consistently did his banking business, testified that at the time of the sale of the cattle the bank had not been consulted and did not know of the order or of the sale.

However, sometime later, the exact date not appearing from the evidence, a check in the sum of $11,756.24 was received by the bank. The bank was one of the payees on the check. Other payees were Paul C. Elberson, Harriet Elberson, William P. Elberson (the 10 year old son of the parties) and William P. Elberson, Sr. (the father of Paul C. Elberson). The check was endorsed by all of the payees. The evidence does not reflect that anyone was present with Mr. Donich and none of the witnesses testified to any specific conversation with him at the time that he endorsed the check on behalf of the bank and deposited it in an account which was entitled *"Paul C. Elberson—Trust Account."*

Donich testified that he did not intend nor expect that the bank was giving up its lien and right to proceeds from the sale of the calves pursuant to the security agreement. Nor did Paul Elberson expect the bank to give up its lien.

There is no record in either the bank's file or the divorce file that the bank was ever served with a copy of the court's order of November 8, 1967, which provided for depositing the proceeds of the sale in a special account subject only to the court's order. There is no certificate of service or acknowledgment of service in the evidence. There is no evidence that

Mr. Donich or anyone on behalf of the bank ever agreed that all of the funds be dispersed without any consideration being given the bank's lien. The Paul C. Elberson Trust Account was opened on November 24, 1967, but no signature card was signed by anyone and the account remained subject only to action by officers of the bank.

Paul Elberson testified he delivered the check to the bank and that he had no conversation with anyone, but thought Mr. Skedd, plaintiff's counsel, had already arranged for that. Mr. Donich, in regard to the creation of the account, testified:

"I don't know how I learned how these funds were supposed to go in an account, oh, whether it was through Paul , I don't know. I just don't have any idea of how I learned that.

"* * *

"Q. But you did know that it was deposited as a result of the court order, did you not? A. Well, under the supposition that there was a court order."

Donich further testified that sometime, but not when, he did become aware of the terms of the court order creating the special account providing the funds to be withdrawn only by court order.

On January 11, 1968, a hearing was scheduled in the divorce proceedings at which time payment of various debts of the parties was to be considered. Paul C. Elberson went to the bank around 9:00 a.m. of that day. The evidence is in dispute as to just what was said that morning, but Mr. Donich testified they discussed how much the bank would require to be paid on its loan; that Mr. Donich dictated a letter addressed "To Whom It May Concern" in which he indicated the bank would be satisfied with $3,000; and, that he delivered the letter to Paul Elberson. Elberson testified that he handed the letter to his attorney, Mr. Brault. It was stipulated that Mr. Brault would testify he did not recall the letter, and there was other testimony to the effect that it was not dis-

428

cussed or taken into consideration at the hearing held on the morning of January 11, culminating in an order of the court that certain bills be paid from the account established from sale of the calves. But, as he testified, Mr. Elberson thought the letter was considered.

The evidence reveals that after the court made its order on January 11, 1968 specifying that certain debts totaling $6,437.68 be paid, Mrs. Free, her attorney, and Mr. Brault, Mr. Elberson's attorney, but not Mr. Elberson, went to the bank and there Harry Alger, deceased at the time of the trial, proceeded to make out bank drafts for each of the items of indebtedness listed in the court's order. Mr. Donich testified this occurred while he was away from the bank, and that when he returned he was told by Alger what had occurred. Upon learning that no provision had been made for the bank, Mr. Donich had Alger charge the special account with $3,173.55, being $3,000 principal and $173.55 interest. Mr. Donich testified that in the ordinary course of events a copy of the advice of charge would be sent to the party involved in the account, presumably Paul Elberson, but he, Donich, did not have personal knowledge as to whether such an advice of charge was sent to Mr. Elberson or not. Elberson testified he received such a notice, but did not know when he received it.

The bank otherwise did not advise anyone of the withdrawal of the $3,173.55 from the account. Elberson testified he was not aware that the court order for payment of funds did not include any provision for the bank, as he had expected it would, and that he did not see a copy of the order after it was prepared.

On February 29, 1968, the court entered its findings of fact and conclusions of law in the divorce proceeding in which was included a provision that the balance of the account resulting from the sale of the calves be dispersed as follows:

"D.   DISTRIBUTION OF FUND CREATED BY COURTS ORDER.

"(1)   A special Account established by. Order of the Court in this cause on the 8th day of November, 1967, in the Deer Lodge Bank and Trust Company, of Deer Lodge, Montana, to be disbursed as follows:

"(a)   Deposited in said account ................................$11,756.24
"(b)   Paid by Court Order January 11, 1968 ........   6,437.68
"(c)   Balance in Account ...............................................   5,318.56
"(d)   Accounts to be paid from fund:
          "Standard Oil Company .................$1,162.94
          "Welch's Truck Stop ......................   600.00
          "Haviland Insurance Company
              "Ranch Liability ..........................   216.00
              "cars, etc. ...................................   254.00

                                                    $2,232.94      2,232.94

"(e)   Balance to be divided between the parties ..$  3,085.62"

We note here, parenthetically, that the district judge in the divorce matter did not even note the perfected security interest. He must not have known or been advised of it; otherwise some note would have been taken.

On March 1, 1968, the court entered its decree of divorce adopting as a part thereof its findings of fact and conclusions of law. On March 4, 1968, Lloyd Skedd took a certified copy of the decree of divorce and went to the bank, where he asked the bank to make payment of the amounts specified in the findings of fact and conclusions of law. Mr. Donich told him that he could not make the payments, since there was not that amount remaining in the account. At that time Mr. Donich informed Mr. Skedd of the bank's withdrawal of the sum of $3,173.55.

Mr. Donich testified Mr. Skedd did not ask him to pay

from the account whatever amounts he could, but wanted all of them paid in accordance with the court's order. Mr. Skedd testified he specifically asked Mr. Donich to pay the sum of $1,542.81, which he expected to be the amount distributable to Harriet Elberson, $600 on account to Welch's Truck Stop and the $254 due to Haviland Insurance Company. Mr. Donich indicated he did not recall being asked to pay those items separately or specifically.

Thereafter on August 12, 1968, $1,162.94 was paid to an oil company because the gasoline dealer would no longer deliver to the ranch. This payment was arranged by counsel for Paul Elberson. Then, on November 8, the bank paid both insurance premium amounts as directed in the court order of February 29, 1968. A claim was advanced that the bank was showing preference in paying claims, etc., all of which was denied by the defendant bank.

Plaintiff filed this suit on March 26, 1969, alleging a special account was created by order of the court in defendant bank on November 8, 1967; that $11,756.24 was thereafter deposited in said account pursuant to said order; that defendant Paul Elberson and defendant bank fraudulently, unlawful, maliciously and oppressively conspired to withhold from plaintiff her share of the property deposited in said special account. For this conversion the plaintiff asked for $2,612.76, her share of the property, and $25,000 punitive or exemplary damages.

Defendant bank denied the funds were deposited pursuant to said court order. Further, that the calves sold to produce said fund were under security agreement to the defendant bank; that said bank, being a payee on the draft, deducted $3,000 plus interest and paid the balance remaining in its custody as directed; that the court order was made without notice to defendant bank and could not discharge the security agreement which predated the court order; that sale of the calf crop was a violation of the security agreement and under said agreement and the Uniform Commercial Code of Montana

the bank was lawfully entitled to apply the proceeds; and, that to hold otherwise is a violation of the Fourteenth Amendment to the United States Constitution.

The matter was tried on these issues before a jury in the district court on April 22, 1970. At the conclusion of all of the evidence the defendant bank moved for a directed verdict, which was denied by the court. The jury was instructed on the law and the case was submitted to it. The jury returned its verdict in favor of the plaintiff and against the defendant Deer Lodge Bank & Trust Company for $2,612.76 actual damages, $25,000 punitive damages and no recovery against Paul C. Elberson. Judgment was entered thereon. After denial of defendant bank's motion for a new trial, defendant bank appeals from the judgment.

The appellant presents nine issues for review which are:

1. Is the evidence sufficient to justify a verdict in favor of the plaintiff and against Deer Lodge Bank & Trust Company?

2. Is there evidence sufficient to find a conversion by Deer Lodge Bank & Trust Company of any assets belonging to Harriet Free?

3. Did the Deer Lodge Bank & Trust Company give up its lien on the calves which were sold and the proceeds thereof and create a special account in which the bank had no interest or was the account a general account as to which the bank had a right of set off?

4. Is the evidence sufficient to justify the jury in awarding punitive damages?

5. Does a verdict for $25,000 punitive damages and $2,612.76 general damages show that the verdict was given under the influence of passion and prejudice upon the facts appearing in the record?

6. Did the trial court err in giving the court's instruction No. 5, over the objection of the Deer Lodge Bank & Trust Company?

432

7. Did the court err in refusing to give either of Deer Lodge Bank & Trust Company's tendered instructions Nos. 19 or 20?

8. Did the trial court err in denying the motion of the Deer Lodge Bank & Trust Company for a directed verdict at the close of all evidence?

9. Did the trial court err in denying the Deer Lodge Bank & Trust Company's motion for a new trial?

██ It would appear there is one general question to be determined before any consideration can be given the specific issues alleged as error. Was the account opened by bank officer Donich on November 24, 1967 by the deposit of the draft representing the proceeds of the calf sale in the amount of $11,756.24 and designated "Paul C. Elberson—Trust Account," a "special account" in the legal meaning of the term or merely a general account with the bank. We find the account on this record to be a general account of the bank and the relation of debtor and creditor established upon deposit.

An adequate explanation of these accounts is contained in the trial court's instruction No. 9, quoted in part as follows:

"You are instructed that the ordinary relationship between a bank and a depositor in the bank is the relationship of debtor and creditor. The funds deposited in a *general account belong to the bank* and the bank has the right of setoff and thus may charge a depositor's account for any amount then due from the depositor to the bank. *A bank account is presumed to be a general account unless there is proof of an agreement between the bank and the depositor creating a special account.*

"*A special account* is a deposit delivered into the possession of the bank to be kept separate and distinct from the general assets of the bank and to be returned or delivered intact on demand, *the title thereto remaining in the depositor. The burden is upon one claiming to have created a special account to prove it by a preponderance of evidence.* To prove a special account there must be shown an agreement was made specifi-

cally and definitely setting forth the terms of the special account and that the bank was not to have ownership or control of the account but that the account was to be set aside from the general assets of the bank to be returned in kind or delivered for a special purpose or purposes * * * A bank does not have the right of set-off against a special account is set aside for a special purpose the bank may set-off the remaining portion against any debt due from the depositor.

"You are instructed that the fact that an account was opened under the name PAUL C. ALBERSON, Trust Account, does not of itself determine that such account was a special account or a trust account. *The status of the account as a general account or as a special or trust account must be determined by the intention of the bank and the depositor* as determined from all of the facts and circumstances surrounding the transaction." (Emphasis supplied.)

In Pethybridge v. First State Bk. of Livingston, 75 Mont. 173, 181, 243 P. 569, 571, the matter of a trust account for a guardianship was ruled not a "special account" in the language:

"* * * the mere fact that the funds deposited were *trust funds* does not constitute a special deposit; the deposit is general, and the relation of debtor and creditor exists between the trustee and the bank * * * and the addition of words showing a fiduciary capacity, while it may render the depository chargeable with notice as to whence the depositor derived the funds, *in the absence of some special agreement for the return of the identical money, or other special circumstances, cannot create a special deposit * * *.*" (Emphasis supplied.)

See also Powell B. & L. Assn. v. Larabie Bros. 100 Mont. 183, 46 P.2d 697. In *Powell* the Court in discussing Keyes v. Paducah & I. Ry. Co., (C.C.A. 6) 61 F.2d 611, 86 A.L.R. 203, said:

"In the last-mentioned case the railway company sought to enjoin the collection of taxes which it alleged had been

illegally levied. The court, instead of requiring a bond, required the defendant to deposit $8,000 in the National Bank of Kentucky pending conclusion of the litigation. *The deposit was made on the order of the court, and a copy of such order was attached to the deposit slip when the money was deposited in the bank, and the bank accepted the deposit fully understanding the situation and with full knowledge that the money was in custodia legis.* On the failure of the bank, a claim for preference was made, which was denied, and the action in that case followed. The court held that no preference arose, that the money was received by the bank in the ordinary business of banking, and, *regardless of the fact that the bank knew that the deposit was made on the order of the court, it was nevertheless a general and not a special deposit, and no right of preference could arise."* (Emphasis supplied.)

Here, respondent does not argue with the court's instructions nor the legal requirements necessary to establish a special account and cites no authority to the contrary. Respondent simply ignores the requirements necessary to establish a special account set forth by this Court, and asserts her position in the following language:

*"The Order of the Court creating the special account* and directing that it be paid only by Court Order, is sufficiently clear to preclude the Bank from having ownership or control of the account and that the account was to be delivered for a special purpose or purposes and that the Bank knew, or should have known, the terms of such agreement at the time it accepted the deposit."* (Emphasis supplied.)

This, of course, further ignores the basic fact that the bank was not a party to the litigation which produced the court order, nor was there any evidence in the record that the bank was served, given, or agreed to such an order. Supposition of the court order or knowledge gained at some unspecified time of the contents of the order, does not satisfy the requirements of a special agreement, as related. The parties to the deposit

testified there was no agreement at the time of the deposit; the circumstances surrounding the deposit may leave a lot to be desired so far as sound business practice is concerned, but they are not circumstances that prove, nor can it be inferred from them, that the bank or the depositor agreed to a special account.

There is no contention that the bank's prior security agreement was not valid, nor that it did not include the calves that were sold. This is further demonstrated by the bank being included as one of the joint "payees" on the draft received in payment for the calves. The bank's authority to set-off against a general account to recover its money was not challenged.

In any event, the failure of proof in the record of the establishment of a special account precludes any verdict for the respondent, as an action in conversion does not lie against a general account as there can be no conversion of a debt. 18 Am. Jur.2d, Conversion, § 10; 44 A.L.R.2d 936, § 7(c), p. 942. As stated, we have here a debtor-creditor relationship.

In view of our holding, there is no necessity to discuss the balance of the issues raised by appellant.

The judgment of the trial court is reversed with instruction that the case be dismissed.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES JOHN C. HARRISON, HASWELL and CASTLES, concur.